IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Personal Restraint of:<br><br>TONY PENWELL,<br><br>      Appellant. | No. 83196-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

  DÍAZ, J. — In 2021, the Department of Corrections (Department) began instituting a plan to consolidate and close prison facilities across Washington State. Tony Penwell filed a personal restraint petition (PRP) challenging the Department's plan, arguing that the consolidation of facilities, prison closures, and facility-to-facility transfers of incarcerated persons expose affected prisoners to COVID-19 and other infectious diseases, such as tuberculosis, and constitute cruel punishment in violation of the state and federal constitutions. Because Penwell cannot establish that the Department's action creates an objectively significant risk of serious harm to him, and because the Department's actions serve legitimate penological goals, we deny his petition.

I. <u>FACTS</u>

  Penwell is a 61-year-old incarcerated individual who was convicted in 2006 of assault in the first degree, rape in the second degree, and unlawful imprisonment. He is currently set to be released on September 9, 2028.

Citations and pin cites are based on the Westlaw online version of the cited material.

The COVID-19 pandemic impacted the state prison population dramatically. Between March 2020 and June 2021, the Department saw a 54 percent decrease in prison admissions compared to the same timeframe between 2019 and 2020. As of July 2021, 4,000 of the 17,000 total prison beds in Washington were vacant. And the average daily prison population was projected to continue decreasing through 2023.[1]

In response to this decreased prison population and an $80-million-dollar reduction to the Department's budget, the Department instituted a plan to consolidate and close prisons across Washington State. This plan had three phases: first, the Department would consolidate units within prison facilities; second, it would institute low-impact closures; and third, it would institute high-impact closures.

In 2021, Penwell was incarcerated at the Washington State Reformatory (WSR) at the Monroe Correctional Complex (MCC). WSR consisted of four housing units: A, B, C, and D. A and B were medium custody level while C and D are minimum custody level. Pursuant to the Department's plan, incarcerated individuals in units C and D, first, were to be transferred consolidated units A and B,[2] and then WSR was to be closed to the general prison population. Accordingly, Penwell, who had been living in a single cell in unit C, first was moved into a cell in unit A.

---

[1] In January 2023, the number of incarcerated individuals was approximately 12,300.
[2] The lower custody units were consolidated into the higher custody units for security, operational, and classification reasons.

There were intervening minor deviations to this process. For example, in 2021, due to an outbreak of COVID-19 in the Twin Rivers Unit (TRU), which is a different facility within the Monroe Correctional Complex, unit C of the WSR was temporarily reopened and used as a medical isolation area for individuals with COVID-19.

On September 28, 2021, Penwell filed this PRP in our Supreme Court and asked for his immediate release from custody and an order prohibiting the Department from consolidating the prison population or conducting any facility-to-facility transfers of incarcerated persons. The Supreme Court transferred the petition to this court.

On May 16, 2022, while this petition was pending, Penwell was transferred as planned out of WSR and placed at the Washington State Penitentiary (WSP) in Walla Walla, Washington. And by January 2023, the Department had completed the planned consolidation and closure of units. While no additional closures are currently scheduled, the Department recognizes that it is possible additional closures will occur in the future if the prison population continues to decrease.

## II.    ANALYSIS

"To obtain relief through a PRP, petitioners challenging the [Department's action] must show they are being unlawfully restrained under RAP 16.4." In re Pers. Restraint of Williams, 198 Wn.2d 342, 352, 496 P.3d 289 (2021). The parties do not dispute that Penwell is under restraint. Therefore, the issue is whether that restraint is unlawful. RAP 16.4(c)(6) makes a restraint unlawful when the conditions or manner of the restraint "are in violation of the Constitution of the

United States or the Constitution or laws of the State of Washington."

Normally, to obtain relief from a PRP based on a constitutional error, a petitioner must make two showings: "(1) a constitutional error occurred and (2) the error resulted in actual and substantial prejudice." Williams, 198 Wn.2d at 353. However, where a petitioner raises a claim for which there was "no previous opportunity for judicial review, such as constitutional challenges to actions taken by prison officials," a petitioner is not required to make a threshold showing of prejudice. In re Pers. Restraint of Gentry, 170 Wn.2d 711, 714-15, 245 P.3d 766 (2010). Instead, the petitioner must show the conditions or manner of restraint violate state law or the constitution. Id. at 715.

Nonetheless, Penwell bears the burden of proving, by a preponderance of evidence, that his restraint is unlawful. In re Pers. Restraint of Cook, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). The petition must be supported by factual evidence, rather than on conclusory allegations. In re Pers. Restraint of Gronquist, 138 Wn.2d 388, 396, 978 P.2d 1083 (1999).

Penwell claims that his conditions of confinement violate article I, section 14 of the Washington Constitution, and the Eighth Amendment to the United States Constitution. Our Supreme Court has recently held that "in the context of prison conditions, which includes prisoners' health and welfare, Washington's cruel punishment clause provides greater protection than its federal counterpart." Williams, 198 Wn.2d at 362. Accordingly, we review this claim under the more protective standards of article 1, section 14.

Article I, section 14 of the Washington Constitution bans cruel punishment.

4

State v. Bassett, 192 Wn.2d 67, 77, 428 P.3d 343 (2018).  To successfully assert that conditions of confinement violate the Washington State Constitution's guarantee against cruel punishment, a detainee must show: "(1) those conditions create an objectively significant risk of serious harm or otherwise deprive them of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal."  Williams, 198 Wn.2d at 368.

First, Penwell contends that by consolidating prisoners, closing prisons, and transferring prisoners from facility-to-facility to effectuate shutdowns, the Department is creating an objectively significant risk of serious harm from COVID-19 and tuberculosis outbreaks.  We reject this claim.

Penwell has made only conclusory allegations and failed to demonstrate that he faces any significant risk of serious harm.  The Department, in contrast, has adduced evidence that it has instituted comprehensive and extensive policies to mitigate the risk of the pandemic to incarcerated persons, generally and as to Penwell himself.

These generalized policies include the use of personal protective equipment, such as surgical masks, the medical isolation and care of individuals with symptoms of COVID-19, and the quarantine of anyone exposed to those infected.[3]  And the Department mandates isolation and testing of all incarcerated

---

[3] Penwell alleges that the Department's response to COVID-19 infection is punitive and intentionally discourages people from reporting.  The Department denies that the quarantine and isolation procedures were designed to be punitive in any way. Rather, the Department employs a system of testing, screening, and contact

persons transferred between facilities. Furthermore, the Department offers COVID-19 vaccinations and boosters to its detainees.[4]

And the record demonstrates that, as the beneficiary of these policies, Penwell does not face any significant risk of serious harm. Penwell is fully vaccinated against COVID-19 and he has received his booster for the vaccine. He is also eligible to receive the bivalent booster for the vaccine, which is available at WSP. And Penwell has already contracted, been treated, and apparently fully recovered from COVID-19 on two separate occasions.[5]

Dr. Alonzo Pezo Salazar, the Statewide Director of Infection & Prevention Control for the Department reviewed Penwell's medical records and concluded that

> Because Mr. Penwell has been diagnosed with comorbidities such as diabetes, hypertension, and obesity, Mr. Penwell is at high risk for negative COVID-19 outcomes (death or hospitalization) when compared to younger, healthier people. However, because he has received his primary series of two doses of the Moderna vaccine, he has protection to some extent over the long term from serious negative outcomes.

(emphasis added). Dr. Areig Awad, the facility medical director at MCC, similarly attested that "[b]ecause the currently available COVID-19 vaccines are highly effective and because he has already had COVID-19 and recovered, it is my

---

tracing to help identify individuals who do not report their symptoms, which measures appear to be standard COVID protocols.

[4] With these protective measures, Washington has a 0.199 percent mortality rate among incarcerated individuals who have tested positive for COVID-19— one of the lowest mortality rates amongst state correctional agencies across the country. See https://www.doc.wa.gov/corrections/covid-19/data-comparative-jurisdictions.htm.

[5] Penwell claims that he has "long COVID," but Dr. Salazar testified that this claim is unsupported by his medical records. He has none of the common symptoms associated with long COVID, and his other complaints (e.g., pain in his back) have been reported for years if not decades.

opinion that Mr. Penwell's risk of severe illness, hospitalization, or death from contracting COVID-19 again is low." And, should Penwell contract COVID-19 again, he has access to Remdesivir and Paxlovid, two highly effective medications used to treat COVID-19.

Moreover, Penwell has already been transferred to his new facility at WSP and the consolidation and closure of facilities has been completed with no further closures planned at this time.

Finally, there is no evidence in the record of any kind that Penwell has suffered any risk of exposure to tuberculosis.[6]

Thus, Penwell does not demonstrate that the Department's consolidation and closure of prison facilities and its transfer of incarcerated persons during COVID-19 create an objectively significant risk of serious harm to Penwell himself or otherwise deprive him of the "basic necessities of human dignity." Williams, 198 Wn.2d at 368; see also Hines v. Youseff, 914 F.3d 1218, 1229 (9th Cir. 2019) (our analysis "'requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused' . . . Instead, courts must 'assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk,' meaning that the risk 'is not

---

[6] The Statewide Infectious Disease Physician for the Department, Dr. Lara Strick, acknowledged that there was a tuberculosis outbreak at the Clallam Bay Corrections Center in Clallam Bay, but noted that there was no known transmission outside of that facility. Dr. Awad attested that "there is no current tuberculosis outbreak at the WSR and there has not been a tuberculosis outbreak at the WSR in over 10 years."

one that today's society chooses to tolerate.'") (citing in <u>Helling v. McKinney</u>, 509 U.S. 25, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)).

Next, Penwell contends that the Department's consolidation and closure plan is not reasonably necessary to accomplish any legitimate penological goal because the purpose of that plan is to accommodate its decreasing budget. We disagree.

Penwell argues that, in order to pass scrutiny here, the conditions of confinement must serve the goals of retribution, deterrence, incapacitation, or rehabilitation. And he contends that "sav[ing] money" does not serve those purposes. To the contrary, the Department's plan is designed to wrench the most benefit for detainees out of the limited resources it is provided. The Department is required to operate within the legislative appropriation. When the legislature decreased the budget, the Department concluded that the best way to serve its incarcerated population was to pool its available resources by reducing the number of "unfunded vacant bed[s]." This plan assured that the Department was not required to stretch its limited resources across a series of partially vacant facilities.

And transporting incarcerated persons between facilities is a critical function of our corrections system. Detainees in Washington arrive at one facility, where they are classified and sent to another facility based on that person's required custody level and programming needs. And incarcerated persons may need to be transferred later pursuant to their medical needs, interpersonal conflicts, or reintegration in society. Each of these transfers is designed to address the

8

individual needs of the incarcerated individual and the safety of the prison population as a whole.

Thus, the conditions of Penwell's custody serve legitimate penological interests.

In short, Penwell's challenge here fails because he does not demonstrate that his conditions of confinement create an objectively significant risk of serious harm and the Department's actions here serve a legitimate penological goal.

### III.    CONCLUSION

Accordingly, without needing to reach any further issue, we deny his petition.

Díaz, J.

WE CONCUR:

Birk, J.

Coburn, J.