**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL ANDREWS,
  *Plaintiff-Appellee*,

v.

CITY OF HENDERSON; PHILLIP
WATFORD; KARL LIPPISCH,
  *Defendants-Appellants*,

and

HENDERSON POLICE DEPARTMENT;
JOSEPH W. EBERT; R. ADAMS; K.
LAPEER; K. LIPPISCH,
  *Defendants.*

No. 20-17053

D.C. No.
2:18-cv-01625-
JCM-BNW

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted August 9, 2021
San Francisco, California

Filed May 23, 2022

Before:  Eugene E. Siler,[*] Morgan Christen, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Forrest

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's denial, on summary judgment, of qualified immunity to two police detectives in an action brought pursuant to 42 U.S.C. § 1983 alleging defendants used excessive force, in violation of the Fourth Amendment, when, without warning, they tackled plaintiff to the ground, fracturing his hip.

Defendants believed they had probable cause to arrest plaintiff for a series of armed robberies and forcibly tackled him as he was leaving a Nevada state courthouse.  The panel held that the use of force was substantial.  Although plaintiff was suspected of a serious crime, viewing the evidence in his favor, the detectives knew that he was not armed and was not posing an immediate threat to anyone as he exited the courthouse.  Under these circumstances, a reasonable jury could find that the degree of force used against plaintiff violated his Fourth Amendment right against excessive force, and the detectives were not entitled to summary

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

judgment on the question of whether they committed a constitutional violation.

The panel further held that *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) clearly established—and thus put a prudent officer on notice—that an officer violates the Fourth Amendment by tackling and piling on top of a relatively calm, non-resisting suspect who posed little threat of safety without any prior warning and without attempting a less violent means of effecting an arrest.

The panel held that it lacked pendent appellate jurisdiction over the district court's denial of the City of Henderson's separate motion for summary judgment because the issue of the City's § 1983 municipal liability was not inextricably intertwined with the detectives' claim of qualified immunity.

## COUNSEL

Michael J. Oh (argued), Senior Assistant City Attorney; Nicholas G. Vaskov, City Attorney; Office of the City Attorney, Henderson, Nevada; for Defendants-Appellants.

Peter Goldstein (argued), Peter Goldstein Law Corp., Las Vegas, Nevada, for Plaintiff-Appellee.

## OPINION

FORREST, Circuit Judge:

Plaintiff Daniel Andrews exited a Nevada state courthouse and, without warning, two plainclothes detectives tackled him to the ground, fracturing his hip. Andrews was not resisting, fleeing, or committing a crime. Moreover, because he had just passed through the courthouse's security checkpoint, including a metal detector and x-ray scanner, the detectives knew that Andrews was unarmed. Andrews sued the detectives and the City of Henderson (collectively, Defendants) under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment. The detectives moved for summary judgment arguing that they are protected by qualified immunity, and the City moved for summary judgment arguing Andrews could not establish municipal liability under any of the theories that he advanced. The district court denied the detectives' motion and denied the City's motion except as to Andrews's ratification theory. We affirm.

## I.  Background

### A.  Factual History[1]

After a series of armed robberies at various businesses in Henderson, Nevada, detectives with the Henderson Police

---

[1] Because this case comes to us on review of the district court's ruling on Defendants' motion for summary judgment, we view the facts in the light most favorable to Andrews. *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021). But "[w]e do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, 'quite clearly contradicts.'" *Id.* (quoting *Scott v. County of San Bernardino*, 903 F.3d 943, 952 (9th Cir. 2018)).

Department (HPD) began surveilling a woman suspected of assisting a man with a recent robbery. On January 3, 2017, the woman left a gas station in a car driven by an unidentified man, and several plainclothes detectives followed behind. The detectives learned from the lead detective on the case that the driver was Andrews and that they had probable cause to arrest him for the armed robberies. The detectives followed the pair to the Henderson Justice Facility parking lot and watched as they exited the vehicle.

The detectives observed Andrews and the woman walk into the Henderson Municipal Courthouse. To enter the courthouse, the pair had to pass through a security checkpoint that included a metal detector and x-ray scanner. One detective followed Andrews and the woman into the courthouse and tracked their location. The other detectives waited outside so they could arrest Andrews after he exited the courthouse because they knew he would be unarmed at that point, having passed through the courthouse's metal detectors. All of the detectives were in plain clothes.

Twenty minutes after entering the courthouse, Andrews and the woman reemerged, and Detectives Phillip Watford and Karl Lippisch walked slowly toward them without identifying themselves. When Detective Watford was approximately a foot away from Andrews, he lunged and tackled him to the ground. Detective Lippisch also jumped toward Andrews and Detective Watford and landed on top of them as they fell. Detective Lippisch kept his weight on Detective Watford's back as Detective Watford handcuffed Andrews's arms behind his back. The detectives' takedown

resulted in an acetabular[2] fracture of Andrews's hip, which required two surgeries.

After the arrest, Detective Watford prepared a "use of force" report detailing the event. Several of Detective Watford's supervisors reviewed the report and video footage of the arrest and determined that the use of force did not violate HPD policy or warrant further action.

## B.  Procedural History

Andrews sued Detectives Watford and Lippisch and the City under 42 U.S.C. § 1983, asserting a Fourth Amendment excessive-force claim against the detectives and a municipal-liability claim against the City. Andrews alleged three theories of municipal liability: (1) failure to train; (2) unconstitutional custom, practice, or policy; and (3) ratification. The Defendants moved for summary judgment, the detectives arguing that they were entitled to qualified immunity and the City arguing that it did not fail to train its officers on the proper use of force or have a policy or custom allowing officers to use excessive force. The City also contended that Andrews did not identify an individual with final policy-making authority who ratified the detectives' allegedly unconstitutional conduct.

The district court denied the detectives' motion for summary judgment raising qualified immunity. It concluded that there was a genuine factual dispute regarding whether the detectives used objectively reasonable force against Andrews. It also determined that the law in this circuit, including *Blankenhorn v. City of Orange*, 485 F.3d 463, 477,

---

[2] An acetabular fracture is caused by a high-energy impact to the bone.

481 (9th Cir. 2007), "clearly established" that "force is only justified when there is a need for force" and that it is excessive to "gang tackle" a person "who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest." Viewing the facts in the light most favorable to Andrews, the district court found that the detectives knew Andrews was unarmed and was not resisting arrest, attempting to flee, or committing a crime when they arrested him. Thus, the district court concluded that "there was simply no clear need for force."

The district court granted in part and denied in part the City's motion for summary judgment. It rejected Andrews's longstanding-policy-or-practice and failure-to-train theories, concluding that he failed to present any supporting evidence. But it denied summary judgment on Andrews's ratification theory, concluding that the detectives' contradicting versions of events, "in addition to the fact that the [detectives] were not disciplined, raises a genuine dispute as to whether their decision to use excessive force was ratified."[3] Defendants timely appealed.

## II.  Discussion

### A.  Qualified Immunity

Qualified immunity shields government officials from civil damages unless an official "violate[s] a clearly established constitutional right." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020). Thus, in

---

[3] Although the City argued that Andrews failed to "put forth evidence indicating that [the detectives'] superiors are final policymakers," the district court declined to address this point because the City raised it in reply, which denied Andrews "an adequate opportunity to respond."

determining whether a police officer is entitled to qualified immunity, courts ask two questions: (1) whether "the officer's conduct violated a constitutional right[,]" and (2) "whether the right was clearly established in light of the specific context of the case." *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021) (quoting *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019)).

Under the collateral order doctrine, we have jurisdiction over interlocutory appeals from denials of qualified immunity. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 944–45 (9th Cir. 2017); *see* 28 U.S.C. § 1291. We have the authority to review such denials "because [q]ualified immunity is immunity from suit, not just a defense to liability," and "[t]he immunity is effectively lost if a case is erroneously permitted to go to trial." *Isayeva*, 872 F.3d at 944–45 (internal quotation marks and citations omitted). But our jurisdictional power is limited to legal issues, not factual disputes. *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022). In other words, "[a] public official may not immediately appeal a *fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Estate of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) (quoting *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018)) (internal quotation marks omitted). But we can decide whether "taking the facts in the light most favorable to the non-moving party, the defendants are entitled to qualified immunity." *Isayeva*, 872 F.3d at 945. And in making this determination, we exercise de novo review. *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th Cir. 2019).

## 1. Fourth Amendment violation

The central question in determining whether law enforcement officers violated the Fourth Amendment by using excessive force is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Williamson*, 23 F.4th at 1151 (internal quotation marks and citation omitted); *see also Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2242 (2021). "All determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

"Neither tackling nor punching a suspect to make an arrest *necessarily* constitutes excessive force." *Blankenhorn*, 485 F.3d at 477 (quoting *Graham*, 390 U.S. at 396) (emphasis added). Instead, whether a constitutional violation occurred depends on "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice*, 989 F.3d at 1121 (quoting *Lowry v. City of San Diego,* 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)) (internal quotation marks omitted). We address each of these considerations in turn.

### a. Type and amount of force

"We consider the 'specific factual circumstances' of the case in classifying the force used." *Williamson*, 23 F.4th at 1151–52 (quoting *Lowry*, 858 F.3d at 1256). Relevant to our

analysis are the "nature and degree of physical contact" and "the risk of harm and the actual harm experienced." *Id.* at 1152 (internal quotation marks and citations omitted). "The presence of non-minor physical injuries . . . is certainly relevant in evaluating the degree of the Fourth Amendment intrusion." *Bryan v. MacPherson*, 630 F.3d 805, 824–25 (9th Cir. 2010).

A physical tackle that results in severe injury may constitute a significant use of force. In *Rice*, for example, we held that an officer's takedown maneuver that resulted in the suspect falling face-first onto the pavement was a "substantial" and "aggressive" use of force where the suspect suffered "'extreme pain' immediately following his arrest and long-term physical pain for which he received medical treatment." 989 F.3d at 1121 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Likewise, in *Santos*, we held that an officer's use of force was "quite severe" where the suspect taken to the ground "suffered a broken vertebra which caused him both pain and immobility." 287 F.3d at 853–54; *see also Blankenhorn,* 485 F.3d at 479 (finding that officers acted unreasonably in "gang-tackling" a plaintiff); *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (finding that grabbing a suspect by the arms, forcibly throwing her to the ground, and twisting her arms could constitute excessive force). In contrast, in *Jackson v. City of Bremerton*, 268 F.3d 646, 650, 652 (9th Cir. 2001), we found that a broken finger during a routine arrest was a "minimal" intrusion.

In this case, the detectives forcibly tackled Andrews to the ground with enough force to fracture his hip. The injury resulted in "excruciating pain" and required two surgeries. Under these circumstances, we conclude that this use of force by the detectives was "substantial" and, therefore,

"must be justified by the need for the specific level of force employed." *Rice*, 989 F.3d at 1121 (quoting *Santos*, 287 F.3d at 855 and *Bryan*, 630 F.3d at 825).

### b. Governmental interest

We evaluate the government's interest in using force by considering three primary factors: "(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Williamson*, 23 F.4th at 1153 (internal quotation marks and citation omitted). "[T]he 'most important' is the second factor—whether the suspect posed an immediate threat to others." *Id*. These factors are not exclusive, however, and must be considered under the totality of the circumstances, including whether "less intrusive alternatives" were available to the officers and whether the officers gave "proper warnings" before using force. *Rice*, 989 F.3d at 1122.; *see Bryan*, 630 F.3d at 831 ("[W]hile by no means dispositive, that [the officer] did not provide a warning before deploying the [taser] and apparently did not consider less intrusive means of effecting [plaintiff's] arrest factor significantly into our *Graham* analysis.").

Applying these factors, we conclude that the government's interest in using substantial force was minimal here. Armed robbery is a serious crime that poses an obvious risk of violence, and this factor suggests that the government *may* have an interest in using force to effect an arrest. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019), *cert. denied sub nom. Browder v. Nehad,* 141 S. Ct. 235 (2020). But we must consider this fact in the full context that the officers faced, including that Andrews was not engaged in any violent or nonviolent criminal conduct when he was

tackled without warning by the detectives. Moreover, taking the evidence in the light most favorable to Andrews, the detectives knew that he was not armed when they tackled him as he exited the courthouse. That is why the officers chose to act when they did. Thus, the risk of violence attributable to Andrews's suspected crimes was mitigated by the specific circumstances in which the officers chose to act.

Nor does the evidence show that Andrews otherwise posed a threat to the officers or members of the public. He was not exhibiting any aggressive behavior, and there were no bystanders within his close proximity when he exited the courthouse. And because Andrews did not know the detectives' identities before they tackled him, there is no dispute that he was not resisting arrest or attempting to flee.

Additionally, the detectives do not challenge the district court's finding that they failed to present "undisputed facts to suggest that tackling [Andrews] was the only option available to them." *See Young v. County of Los Angeles*, 655 F.3d 1156, 1166 (9th Cir. 2011) ("That [the defendant employed intermediate force] given the availability of other, less intrusive measures makes clear just how limited was the government's interest in the use of significant force."); *Bryan*, 630 F.3d at 831. They also do not dispute that they gave Andrews no warning before they tackled him. *See Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011) ("[W]arnings should be given, when feasible, if the use of force may result in serious injury." (internal quotation marks and citation omitted)). Given this broader context, the nature of Andrews's suspected crime does not establish a strong governmental interest in using significant physical force against him.

In arguing to the contrary, the detectives assert that they had a strong interest in using force because Andrews was

suspected of committing multiple armed robberies and, therefore, posed "legitimate, significant risks" to the safety of others outside the courthouse. We do not suggest that the severity of the suspected crime has no bearing on whether a suspect poses a threat to officers or the public—of course it does. *See Browder*, 929 F.3d at 1136; *Monzon*, 978 F.3d at 1157. But the serious nature of a suspected crime does not *necessarily* give rise to a strong governmental interest in the use of significant physical force. *See Browder*, 929 F.3d at 1136.

Our precedent requires that we focus on the *immediate* threat of harm. That is, we consider the "danger a suspect poses *at the time force is applied*." *Id.* (emphasis added); *see id.* ("Even if [the suspect] had made felonious threats or committed a serious crime prior to [the officer's] arrival, he was indisputably not engaged in any such conduct when [the officer] arrived, let alone when [the officer] fired his weapon."); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (holding that the suspected domestic violence crime provided minimal justification for the officers' use of force where the suspect "was standing on his porch alone and separated from his wife" and "had no guns or weapons in his possession").

Thus, as we have explained, although Andrews was suspected of a serious crime, viewing the evidence in his favor, the detectives knew that he was not armed and was not posing an immediate threat to anyone as he exited the courthouse. Accordingly, because any immediate threat to safety was minimal, "the nature of the crime at issue provides little, if any, basis for the officers' use of physical force." *Smith*, 394 F.3d at 703.

### c.  Balance of interests

Finally, we weigh whether the detectives' "degree of force used was warranted by the governmental interests at stake," *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001), and we conclude that it is not. The detectives' interest in using significant force against Andrews is undermined by their knowledge that he was unarmed; his lack of any aggressive, threatening, or evasive behavior; and the detectives' failure to provide any prior warning or consider less intrusive alternatives before forcibly tackling him to the ground. Under these circumstances, a reasonable jury could find that the degree of force used against Andrews violated his Fourth Amendment right against excessive force, and the detectives are not entitled to summary judgment on the question of whether they committed a constitutional violation. *See Rice*, 989 F.3d at 1124.

## 2.  Clearly Established Right

Even if a government official violates a constitutional right, the official is entitled to qualified immunity unless the violated right was clearly established at the time of the incident. *Id.* at 1120. A constitutional right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

The Supreme Court has increasingly reiterated that to meet this standard a right "must be defined with specificity" rather than "at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (citation omitted); *see City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). "Such specificity is 'especially important in the

Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Bond*, 142 S. Ct. at 11–12 (quoting *Mullenix*, 577 U.S. at 12). Thus, "[a]lthough this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas*, 142 S. Ct. at 7–8 (quoting *White v. Pauly,* 137 S. Ct. 548, 551 (2017)) (internal quotation marks omitted).

In *Blankenhorn*, we analyzed whether a three-officer "gang tackle"[4] of a person suspected of misdemeanor trespass at a shopping mall amounted to excessive force under the Fourth Amendment. 485 F.3d at 467–70. In that case, when the suspect refused an officer's orders to kneel and be handcuffed, several officers "immediately . . . jumped on [him]" and tackled him to the ground while punching him several times in the face and body. *Id.* at 469–70.

In concluding that a rational jury could find that the officers' use of force was objectively unreasonable, we found it significant that the severity of the suspected offense was minimal and the officers' "only bases for suspecting that [the plaintiff] was interfering with mall business were his presence at the mall, his previous banishment, his known gang association, and the attention by security." *Id.* at 478. We also concluded that the suspect "did not pose a serious threat to the officers' or others' safety" where the officers stood around with their arms folded and did not prevent mall

---

[4] *Blankenhorn* does not define "gang tackle," but it is clear that this term refers to an incident where more than one officer uses bodily force to bring an individual "to the ground." 485 F.3d at 478.

patrons from entering the area. *Id.* Finally, although the suspect verbally refused to comply with one officer's direction that he kneel down, we held that a reasonable jury could conclude that the officers' use of force was unreasonable because they did not employ a lesser means of force before immediately tackling the plaintiff, and the plaintiff did not resist a lesser means of force before he was tackled. *Id.* at 478–79.

We hold that *Blankenhorn* clearly established—and thus "put a prudent officer on notice"—that an officer violates the Fourth Amendment by tackling and piling on top of a "relatively calm," non-resisting suspect who posed little threat of safety without any prior warning and without attempting a less violent means of effecting an arrest. 485 F.3d at 478, 481. As discussed above, these are the basic facts of this case when viewed in the light most favorable to Andrews. He was not fleeing, resisting arrest, or actively committing a crime, and the detectives knew that he was unarmed and specifically planned their tackle for that moment because of that knowledge. Accordingly, after *Blankenhorn*, it was "beyond debate" that their actions were objectively unreasonable under the circumstances. *White*, 137 S. Ct. at 551.

The only relevant distinction between this case and *Blankenhorn* is the nature of the suspected crimes—trespass versus armed robbery. The detectives claim that this distinction warrants reversal because *Blankenhorn* is only factually similar when analyzed at an inappropriately "high level of generality." *Rivas-Villegas*, 142 S. Ct. at 8. We reject this assertion. In both cases, the suspects posed no *immediate* threat to the officers or public safety when they were arrested. And other than the nature of the suspected crime, the facts of this case are either analogous to or more

favorable to Andrews than the facts in *Blankenhorn*. For example, the suspect in *Blankenhorn* was "rude, uncooperative, and verbally abusive" before his arrest. 485 F.3d at 469. But here, Andrews had no interaction with the detectives before they tackled him so they had no sense of whether he would be cooperative or not. Accordingly, we hold that *Blankenhorn* involved sufficiently similar facts to "move [this] case beyond the otherwise hazy borders between excessive and acceptable force." *Rivas-Villegas*, 142 S. Ct. at 9.

This conclusion is further buttressed by our precedent clearly establishing that a suspect's previous violent conduct does not justify non-trivial force where the suspect poses no *immediate* safety threat. *See, e.g.*, *Smith,* 394 F.3d at 702. In *Smith*, for example, a woman called the police to report domestic abuse by her husband and informed them "that [he] did not have a gun" and "there were no weapons in the house." *Id.* at 693. While arresting the husband, the officers pepper sprayed him, threw him to the ground, and ordered a dog to attack him. *Id.* at 694. In holding that the officers used excessive force, we explained that the severity of the husband's crime provided "little" justification for the officers' use of substantial force because "[the husband] was standing on his porch alone and separated from his wife," and because "[he] had no guns or other weapons in his possession and there were none in the house." *Id.* at 702–03. There, as in this case, we held that the government's interest in using significant force was low as there was no "basis for believing that [the husband] was armed or that he posed an immediate threat to anyone's safety." *Id.* at 702.

We have held this general principle to be true even in cases where the officers *did* know that a suspect was armed. *See George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013)

(finding that officers used excessive force against a knowingly armed domestic violence suspect where his wife "was unscathed and not in jeopardy when deputies arrived," and the man was "not in the vicinity" but "on the couple's rear patio."); *Glenn*, 673 F.3d at 873 (finding that the officer's use of a bean bag gun against a suicidal suspect brandishing a knife was excessive where he was not threatening anyone but himself); *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (finding that deadly force against an armed suspect who had engaged in a shoot-out the previous day was not justified where he was running back inside the cabin where he resided and made no threatening movements). Thus, in addition to *Blankenhorn*, we find this precedent provided the detectives with ample notice that their surprise takedown violated Andrews's Fourth Amendment rights. *See Rivas-Villegas*, 142 S. Ct. at 9.

In sum, it was clearly established before the events of this case that the Fourth Amendment prohibits multiple officers from physically tackling a "relatively calm" suspect without providing any warning where the suspect is not posing an immediate danger to anyone, resisting arrest, or trying to flee unless the officers first attempt a less intrusive means of arrest. *Blankenhorn*, 485 F.3d at 481.

For all these reasons, we affirm the district court's denial of qualified immunity at summary judgment.

## B. Pendent Jurisdiction

Although this case comes before us on interlocutory appeal, the City requests that we exercise pendant jurisdiction over the district court's denial of its separate motion for summary judgment on Andrews's ratification theory. "A municipality is not entitled to assert the defense

of qualified immunity." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1139 (9th Cir. 2018) (quoting *Huskey v. City of San Jose*, 204 F.3d 893, 902 (9th Cir. 2000)). "Thus the rule . . . that individual defendants can appeal from the denial of a motion for a summary judgment to obtain review of the merits of their qualified immunity defense does not empower a federal court to consider the denial of a municipality's motion for a summary judgment in a § 1983 action." *Huskey*, 204 F.3d at 902.

Nevertheless, a court may exercise pendent jurisdiction and "review an otherwise non-appealable ruling when it is 'inextricably intertwined' with . . . the order properly before [the court]." *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1154 (9th Cir. 2018) (quoting *Meredith v. Oregon*, 321 F.3d 807, 812–13 (9th Cir. 2003)). This standard is met only when the issues are "(a) . . . so intertwined that [the Court] must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Hernandez,* 897 F.3d at 1139–40. We interpret this standard "narrowly" and apply it only in "extremely limited" circumstances. *Id.* at 1139 (quoting *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1109 (9th Cir. 2016)).

We conclude that the City's § 1983 municipal liability is not inextricably intertwined with the detectives' claim of qualified immunity. The detectives' qualified immunity defense turns on whether they violated clearly established federal law, but the City's liability turns on whether an "official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). We need not decide the ratification issue in order to resolve whether the detectives are entitled to

qualified immunity. *See Hernandez*, 897 F.3d at 1139–40. Nor does our qualified immunity decision "necessarily resolve[]" whether the City ratified the detectives' unconstitutional use of force. *See id.*; *Swint v. Chambers County Comm'n*, 514 U.S. 35, 50–51 (1995). Accordingly, we lack pendent appellate jurisdiction over the denial of the City's motion for summary judgment on Andrews's ratification theory.

**AFFIRMED.**