**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELIZABETH CARLEY,

   *Plaintiff-Appellee*,

 v.

ROMEO ARANAS,

   *Defendant-Appellant*,

 and

NEVEN, Warden; GENTRY, Warden; DZURENDA, Director; COX, Director; CLARK, B.B.; FLORES, L.V.,

   *Defendants*.

No. 23-15271

D.C. No.
2:17-cv-02346-
MMD-CLB

OPINION

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted April 2, 2024
Phoenix, Arizona

Filed June 3, 2024

Before:  Richard R. Clifton, Jay S. Bybee, and Bridget S.
Bade, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Prisoner Civil Rights

The panel reversed the district court's denial, on summary judgment, of qualified immunity to Dr. Romeo Aranas, the former Medical Director of the Nevada Department of Corrections ("NDOC") in a 42 U.S.C. § 1983 action brought by Elizabeth Carley, an inmate in the custody of the NDOC, who alleged that Aranas was deliberately indifferent to her medical needs when he denied her request for certain Hepatitis C ("HCV") treatment.

The panel held that Dr. Aranas was entitled to qualified immunity because no clearly established law rendered the HCV policies unconstitutional at the time of the alleged violation.

The panel determined that the appropriately narrow inquiry asks whether a prison medical director between August 2013 and May 2018 would have been on notice that the NDOC HCV policy pertaining to treatment priorities for inmates was unconstitutional at the time. The appropriate inquiry is not whether evolving medical standards prescribed

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a course of best treatment and practice but whether the medical standard was so well established that the failure to prescribe the course of treatment could only be considered deliberate indifference within the meaning of the Eighth Amendment.

The panel concluded that no decision of the Supreme Court, this court, or a "consensus of courts" would have put Dr. Aranas on notice that the relevant inmate treatment prioritization schemes violated the Eighth Amendment during his time as the NDOC Medical Director. Accordingly, the panel reversed the district court's order and remanded with instructions to grant summary judgment for Dr. Aranas.

## COUNSEL

Chris Davis (argued), Senior Deputy Attorney General; D. Randall Gilmer, Chief Deputy Attorney General; Aaron D. Ford, Nevada Attorney General; Nevada Office of the Attorney General, Las Vegas, Nevada; Douglas R. Rands, Deputy Assistant Attorney General, Nevada Office of the Attorney General, Carson City, Nevada; for Defendant-Appellant.

Lisa A. Rasmussen (argued), The Law Offices of Kristina Wildeveld & Associates, Las Vegas, Nevada, for Plaintiff-Appellee.

## OPINION

BYBEE, Circuit Judge:

Elizabeth Carley is an inmate in the custody of Nevada Department of Corrections ("NDOC"). She filed a suit under 42 U.S.C. § 1983 alleging that Dr. Romeo Aranas, the former Medical Director of NDOC, was deliberately indifferent under the Eighth Amendment for denying her request for certain Hepatitis C ("HCV") treatment. The district court denied summary judgment, concluding that he was not entitled to qualified immunity at that time.

Dr. Aranas appeals the district court's denial of his motion for summary judgment, arguing that he is entitled to qualified immunity. We have jurisdiction pursuant to 28 U.S.C. § 1291. *See Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022). Because no clearly established law rendered the HCV treatment policies unconstitutional at the time of the alleged violation, we reverse.

## I.  BACKGROUND

A.  *Factual Background*

1.  Hepatitis C

Hepatitis C is a "blood borne pathogen transmitted primarily by way of percutaneous exposure to blood." HCV can cause liver fibrosis—or scarring to the liver—which may "lead to cirrhosis of the liver, a liver disease that forestalls common liver function." A common, non-invasive method used to measure the disease's progression is the Aspartate Aminotransferase Platelet Ratio Index ("APRI"). A patient's APRI score, along with clinical symptoms, are "reliable indicator[s] of liver fibrosis," although not definitive.

Over the past several years, the landscape of HCV treatment has changed dramatically. In 2013, the FDA began approving direct acting antivirals ("DAAs") as a new treatment, which were shown to cure HCV in 95–99% of cases. Previous treatments had significant side effects and were much less effective. However, the new DAA treatments were often costly and were not recommended for all HCV patients until 2015. *See*, *e.g.*, *Atkins v. Parker*, 972 F.3d 734, 736 (6th Cir. 2020) ("In 2015, the cost of a single course of treatment using direct-acting antivirals was between $80,000 and $189,000. By the time of trial [in 2019], those prices had dropped to between $13,000 and $32,000 per course of treatment.").

2. National HCV Recommendations

The American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") develop and publish "Recommendations for Testing, Managing, and Treating Hepatitis C" to "provide healthcare professionals with timely guidance as new therapies are available and integrated into HCV regimens." These Recommendations are updated frequently to reflect the evolving information related to HCV treatment. For example, the 2014 Recommendations provided the following guidance:

> Immediate treatment is assigned the highest priority for those patients with advanced fibrosis . . . , those with compensated cirrhosis . . . , liver transplant recipients, and patients with severe extrahepatic hepatitis C.
>
> *Based on available resources*, immediate treatment *should be prioritized* as necessary

so that patients at high risk for liver-related complications and severe extrahepatic hepatitis C complications are given high priority.

(Emphasis added). By December 2015, though, AASLD/IDSA began recommending treatment for *all* patients with chronic HCV, except for those with a short life expectancy. Even then, the 2015 Recommendations noted that "[o]ngoing assessment of liver disease is recommended for persons in whom therapy is deferred." Additionally, it recognized that "[s]tate prisons and jails are usually excluded from Medicaid-related rebates and often do not have the negotiating leverage of larger organizations and may end up paying higher prices than most other organizations." According to Carley's expert, the AASLD/IDSA Recommendations set the standard of care for HCV treatment, and by 2015 "DAAs [we]re the standard of medical care for 'all patients.'"

### 3. Federal Bureau of Prisons HCV Policies

The Federal Bureau of Prisons ("BOP") provided guidelines for the treatment of inmates with HCV as well, which were updated as information regarding DAAs developed. The 2014 BOP Guidelines "established treatment priorities for inmates who have a more urgent need for intervention" because "the most recently published guidance on HCV treatment . . . indicate[d] that it [wa]s reasonable to postpone treatment for cases with less advanced fibrosis." Federal Bureau of Prisons, Interim Guidance for the Management of Chronic Hepatitis C, 1 (June 2014). Specifically, "[t]he BOP . . . prioritize[d] for treatment inmates who ha[d] an APRI score ≥ 1.0, or whose APRI score [was] between 0.7 and 1.0 along with other

findings suggestive of advanced fibrosis (low albumin or platelets, elevated bilirubin or INR)." *Id.*

The 2015 BOP Guidelines altered its prioritization scheme, relying on the AASLD/IDSA Recommendations from June 2015 that "indicate[d] that it [wa]s reasonable during this time of transition to prioritize for treatment those HCV cases with the most urgent need." Federal Bureau of Prisons, Evaluation and Management of Chronic Hepatitis C Virus Infection, i, 7 (July 2015). It provided "Priority Criteria" that divided patients into four priority levels "to ensure that those with the greatest need are identified and treated first." *Id.* at 7. Priority Level 1, which received highest priority for treatment, included patients with cirrhosis, liver transplant candidates or recipients, patients with hepatocellular carcinoma, patients with comorbid medical conditions associated with HCV, patients on immunosuppressant medication for a comorbid medical condition, and patients needing to continue treatment if they had already started it. *Id.* Priority Level 2, which received high priority for treatment, included patients with an APRI score $\geq 2$, advanced fibrosis, HBV coinfection, HIV coinfection, and comorbid liver diseases. *Id.* at 8. Priority Level 3, which received intermediate priority for treatment, included patients with stage 2 fibrosis, an APRI score of 1.5 to $< 2$, diabetes mellitus, and porphyria cutanea tarda. *Id.* Lastly, Priority Level 4, which received routine priority for treatment, included patients with stage 0 to stage 1 fibrosis and all other patients with HCV. *Id.*

The October 2016 BOP Guidelines again adjusted the prioritization scheme, providing three updated priority levels. Federal Bureau of Prisons, Evaluation and Management of Chronic Hepatitis C Virus Infection, 8 (October 2016). Level 1 (high priority for treatment)

included patients with the same clinical characteristics from the 2015 Guidelines, while also including patients with an APRI score of ≥ 2.0. *Id.* However, Levels 2 and 3 contained changes, and Level 4 was eliminated. *Id.* Level 2 included patients with evidence of progressive fibrosis (APRI score ≥ 1.0 and stage 2 fibrosis), those with comorbid medical conditions, and chronic kidney disease. *Id.* Level 2 patients were to be given intermediate priority for treatment. *Id.* Level 3 included patients with stage 0 to stage 1 fibrosis and those with an APRI score of < 1, and these patients were given low priority for treatment. *Id.* The 2017 and 2018 BOP Guidelines maintained a similar three-level prioritization scheme. *See* Federal Bureau of Prisons, Evaluation and Management of Chronic HCV Infection (May 2017); Federal Bureau of Prisons, Evaluation and Management of Chronic HCV Infection (January 2018).

### 4. NDOC HCV Policies

Medical Directive 219 is the policy that guides the monitoring and treatment of NDOC inmates diagnosed with HCV. During Dr. Aranas' time as Medical Director, MD 219 was updated regularly and frequently reflected the updates to the BOP Guidelines. Notably, the 2014 version of MD 219, which was the first version signed by Dr. Aranas, mirrored the BOP prioritization of patients with APRI scores ≥ 1.0, advanced hepatic fibrosis or cirrhosis, liver transplant recipients, HIV co-infection, comorbid medical conditions associated with HCV, and patients who were being treated at the time of incarceration. The 2014 MD 219 excluded from treatment patients with an "APRI score < 1.0 (score of < 0.7 if there [were] other findings suggestive of advanced fibrosis/cirrhosis.[)]"

Similarly, NDOC altered the 2015 MD 219 in response to the updated BOP Guidelines.  The 2015 MD 219 changed the "exclusion criteria for treatment" to exclude patients with an "APRI score of < 2.0 (score of < 1.5 if there [were] other findings suggestive of advanced fibrosis/cirrhosis[)]."  This APRI score exclusion criteria remained the same through the final MD 219 signed by Dr. Aranas in March 2018.

B.  *Procedural Background*

1.  Carley's Grievances

Carley was diagnosed with HCV in April 2013 and enrolled in the Chronic Disease Center based on that diagnosis in June 2014.  Carley's APRI scores fluctuated while Dr. Aranas was the Medical Director, ranging from 0.7 to 1.9 between 2013 and 2018.  It is undisputed, though, that her scores never reached the minimum score needed to qualify for DAA treatment under NDOC's policies.

However, after learning her APRI score rose to 1.9 in May 2016, Carley filed an informal grievance requesting she receive DAA treatment immediately.  Both her informal grievance and subsequent first-level grievance were denied because her APRI scores—which had dropped to 1.3 upon further testing—did not qualify her for further treatment. Carely filed a second-level grievance.  Although Dr. Aranas had not examined or treated her previously, he denied her second-level grievance under the 2015 MD 219, stating that "our Hep C treatment is based on the Bureau of Prison guidelines that we are following.  Your APRI is 1.3 and does not require treatment as of this time but you are being monitored thru [sic] our chronic clinic."

2.  Federal Proceedings

After exhausting the prison's formal grievance process, Carley filed a pro se complaint under 42 U.S.C. § 1983 against Dr. Aranas and several other prison officials alleging violations of her Eighth Amendment rights for failing to treat her HCV.  Several other NDOC inmates filed similar actions, resulting in the consolidation of the cases and an eventual settlement of their prospective claims.  *See In re HCV Prison Litigation*, No. 19-CV-00577, 2020 WL 6363842 (D. Nev. Oct. 29, 2020).  A Consent Decree was entered in that litigation on October 29, 2020, which resulted in Carley receiving DAA treatment in 2021.[1]

In 2022, Defendants filed a motion for summary judgment for the claims left unresolved by the Consent Decree.  In a Report and Recommendation ("R&R"), the magistrate judge recommended that Defendants' motion be granted.  The district court rejected the R&R, reasoning that "there is a genuine dispute of material fact as to whether Defendants were deliberately indifferent to [Carley's] serious medical needs by delaying her Hepatitis C . . . treatment."  The district court then dismissed most of the Defendants because they had not personally participated in Carley's treatment.

The district court concluded, however, that Dr. Aranas had personally participated in the alleged violation because he was "responsible for the formulation of health policy which included developing and monitoring standards and procedures for health care services for all NDOC inmates."

---

[1] The settlement included a new version of MD 219 that provided for HCV testing for all incoming NDOC and guaranteed DAA treatment for all inmates with HCV within a prescribed time period.

In addressing Aranas' remaining qualified immunity arguments, the district court concluded that "there is still a genuine dispute of material fact as to whether Aranas was deliberately indifferent to [Carley's] serious medical needs." Thus, the court determined Dr. Aranas was "not entitled to qualified immunity at this time," and denied the motion as to Dr. Aranas.

## II. STANDARD OF REVIEW

"We review whether the officials are entitled to qualified immunity de novo . . . ." *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th Cir. 2019). "Where there are disputed issues of material fact, our review is limited to whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012) (citation omitted).

## III. ANALYSIS

Section 1983 of Title 42 provides a cause of action in tort against any person who, under color of law, "deprive[s any person] of any rights, privileges, or immunities secured by the Constitution." *See Whalen v. McMullen*, 907 F.3d 1139, 1145 (9th Cir. 2018). The Supreme Court has "consistently . . . held that government officials are entitled to some form of immunity from suits for damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). "For officials whose special functions or constitutional status requires complete protection from suit"—such as legislators and judges acting within their respective functions—the immunity from suit is absolute. *Id.* at 807. For most executive branch officials, however, "qualified immunity represents the norm." *Id.* "Qualified immunity balances two important interests—the

need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Because "qualified immunity is immunity from suit, not just a defense to liability, and the immunity is effectively lost if a case is erroneously permitted to go to trial," officials are entitled to an early determination whether they must proceed to trial. *Andrews*, 35 F.4th at 715 (internal quotation marks, alterations, and citation omitted). "To determine whether an official is entitled to qualified immunity, we ask two questions: (1) whether the official's conduct violated a constitutional right; and (2) whether that right was 'clearly established' at the time of the violation." *Hines*, 914 F.3d at 1228 (citation omitted). The Supreme Court has said that we have discretion to determine which of these questions "should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

> If we answer the first of the two inquires in the negative, then the officer's conduct was constitutional, and there can be no violation of § 1983. The officer has no need for immunity; he is innocent of the alleged infractions. If the answer to the first question is "yes" and the second question "no," then the officer's conduct is protected by qualified immunity. Only when an officer's conduct violates a clearly established constitutional right—when the officer should have known

> he was violating the Constitution—does he forfeit qualified immunity.

*Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc); *see Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014) (reversing the Sixth Circuit's affirmance of a denial of summary judgment because "the officers did not violate the Fourth Amendment" or, alternatively, because "the officers were entitled to qualified immunity because they violated no clearly established law").    To state the proposition differently:  It is not sufficient for the district court to conclude that the plaintiff has proven a constitutional injury, or that there are material facts in dispute that, if proven, would establish a constitutional violation.  The court must proceed to the second step to decide whether the violation was "clearly established at the time of the violation."  *Hines*, 914 F.3d at 1228 (internal quotation marks and citation omitted).

The district court here concluded that "there is still a genuine dispute of material fact as to whether Aranas was deliberately indifferent to [Carley's] serious medical needs." The district court, however, did not proceed to the second step of the qualified immunity inquiry.  Instead, it concluded that "Aranas is not entitled to qualified immunity at this time."  This was error.  Even assuming that Dr. Aranas violated Carley's constitutional rights (the step one inquiry), Dr. Aranas is entitled to qualified immunity unless Carley can demonstrate that Dr. Aranas knew or should have known that he was violating Carley's Eighth Amendment rights (the step two inquiry).  The burden of proof rests with Carley. *See Simmons v. G. Arnett*, 47 F.4th 927, 934–35 (9th Cir. 2022).

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). We have emphasized that "the constitutional question [must have been] beyond debate." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (citation omitted); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (holding that "in the light of pre-existing law the unlawfulness [of the challenged action] must be apparent" (citation omitted)); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Carley primarily relies on *Farmer v. Brennan* for the proposition that prison officials are deliberately indifferent when "the official knows of and disregards an excessive risk to inmate health." 511 U.S. 825, 837 (1994). That proposition is far too broad to put public officials on "fair notice" of their constitutional obligations. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). We recently stated that "it is not sufficient that *Farmer* clearly states the general rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an inmate. To be clearly established, the relevant right must have been defined more narrowly." *Hampton v. California*, 83 F.4th 754, 769 (9th Cir. 2023) (internal quotation marks and citation omitted). Although *Farmer* provided needed clarification for the deliberate-indifference-to-serious-medical-needs standard first set forth in *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela*

*v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (internal quotation marks and citations omitted); *see also Hamby*, 821 F.3d at 1090 ("[O]ur circuit has been repeatedly chastised for conducting the clearly established inquiry at too high a level of generality." (citation omitted)).

It is true that we have held that prison doctors are deliberately indifferent when they fail to provide or delay providing necessary medical treatment. *See*, *e.g.*, *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). But again, we believe this defines the right too broadly in light of our precedents that require us to "look at the law 'in light of the specific context of the case, not as a broad general proposition.'" *Hines*, 914 F.3d at 1229 (quoting *Mullenix*, 577 U.S. at 12). Instead, "a plaintiff must prove that 'precedent on the books' at the time the officials acted 'would have made clear to [them] that [their actions] violated the Constitution.'" *Hamby*, 821 F.3d at 1091 (alterations in original) (quoting *Taylor v. Barkes*, 575 U.S. 822, 827 (2015) (per curiam)).

Applying these principles, we conclude that the appropriately narrow inquiry asks whether a prison medical director between August 2013 and May 2018 would have been on notice that the NDOC HCV policy was unconstitutional at the time. The appropriate inquiry is not whether evolving medical standards prescribed a course of best treatment and practice, but whether the medical standard was so well established that the failure to prescribe the course of treatment could only be considered deliberate indifference within the meaning of the Eighth Amendment. *Cf. Hamby*, 821 F.3d at 1092 ("For purposes of determining qualified immunity, therefore, we must ask the narrower questions: . . . given existing case law at the time, was it

'beyond debate' that the prison officials pursued a medically unreasonable course of treatment by declining to refer [an inmate] for a surgical evaluation?").

Carley fails to point to any precedent from the Supreme Court, our court, or "a robust consensus of cases of persuasive authority," *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) (per curiam) (citation omitted), that governs the facts here. Instead, she argues that MD 219 "contravened national and community guidelines" and "directly violated the [national] standard of care." Although "[t]he community standard of care outside the prison context is highly relevant in determining what care is medically acceptable and unacceptable" in relation to whether Dr. Aranas was deliberately indifferent to Carley's serious medical needs, *Balla v. Idaho*, 29 F.4th 1019, 1026 (9th Cir. 2022) (internal quotation marks and citations omitted), the standard of care is not the same as "clearly established law."

Our own search reveals no case that would have put Dr. Aranas on notice that MD 219 was unconstitutional. Indeed, the Eleventh Circuit reached a contrary conclusion in *Hoffer v. Sec'y, Florida Dept. of Corrections*, 973 F.3d 1263 (11th Cir. 2020). Addressing "whether the Eighth Amendment requires Florida prison officials to treat all inmates with chronic Hepatitis C . . . with expensive, state-of-the-art 'direct acting antiviral' (DAA) drugs," *id.* at 1266, it found that the Secretary of the Florida DOC, who set procedures for HCV treatment similar to MD 219, "isn't *refusing* or *denying* medical care to any HCV-positive inmate. He may not be providing . . . inmates the particular course of treatment that they and their experts want—or as quicky as they want it—but he isn't turning a blind eye, either," *id.* at 1272. It concluded that the prisoner's § 1983 claim failed at step one because modest care, "even where a complete cure

may be available," often meets "the minimally adequate medical care standard that the Eighth Amendment imposes." *Id*. at 1273 (internal quotation marks and citation omitted).

Ultimately, the court reversed the district court's injunction mandating DAA treatment for all HCV-positive inmates. *Id.* at 1279. Two other circuits reached the same conclusion, albeit in unpublished decisions. *Woodcock v. Correct Care Sols.*, 861 F. App'x 654, 656, 659–61 (6th Cir. 2021) (unpublished) (holding that a 2018 HCV treatment prioritization scheme that "mostly mimic[ked]" the BOP Guidelines did not constitute deliberate indifference); *Roy v. Lawson*, 739 F. App'x 266, 267 (5th Cir. 2018) (per curiam) (unpublished) ("To the extent Roy specifically complains that he has been denied access to the optimum drug therapies for Hepatitis C because they are too expensive, he similarly fails to show any resulting constitutional violation."). Only the Third Circuit, also in an unpublished opinion, has reached a contrary conclusion. *Abu-Jamal v. Kerestes*, 779 F. App'x 893, 900 (3d Cir. 2019) (unpublished) ("[I]t was clearly established that denying particular treatment to an inmate who indisputably warranted that treatment for nonmedical reasons would violate the Eighth Amendment."); *see also Woodcock*, 861 F. App'x at 666 (Stranch, J., concurring in part and dissenting in part) (concluding that "[a] reasonable jury could find [the Kentucky HCV treatment policy] to be evidence of deliberate indifference to a substantial risk to inmate health, in violation of the Eighth Amendment").

We need not go so far. The Eighth Amendment standard for treating HCV-positive inmates cannot be "beyond debate," *Hamby*, 821 F.3d at 1092, if the courts that have addressed the issue on the merits (step one) have reached conflicting conclusions. We thus join the D.C. and Fourth

Circuits in concluding that prison officials are entitled to qualified immunity at step two because any constitutional violation was not clearly established at the time. In the most recent decision, the Fourth Circuit concluded that "no precedent on the books . . . would have made clear to [prison Medical Directors] that [their HCV prioritization policies] violated the Constitution." *Pfaller v. Amonette*, 55 F.4th 436, 455 (4th Cir. 2022) (citation omitted). In *Pfaller*, the Fourth Circuit reversed a denial of qualified immunity grounds for the doctor that designed an HCV policy similar to the prioritization system at issue here. *Id.* at 442. The court assumed without deciding that the policy was deliberately indifferent but held that the case law at the time did not give the medical director "fair warning that his system-wide treatment Guidelines . . . were constitutionally deficient." *Id.* at 454.

The court emphasized that we "must remember qualified immunity's purpose:    it 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The court noted, "there was—*and remains*—an open question as to what kind of treatment protocol for administering direct-acting antivirals is constitutionally sufficient in a prison system." *Id.* at 454–55 (emphasis added). The D.C. Circuit reached a similar conclusion. *See Bernier v. Allen*, 38 F.4th 1145, 1157 (D.C. Cir. 2022) (concluding that no case "recognize[d] a clearly established right of a patient under medical management of a serious disease, monitored and apparently stable, immediately to receive the most recently recommended treatment"); *see also id.* at 1158 (Silberman, J., concurring in the judgment) (concluding that there was no Eighth Amendment violation).

For our purposes, it is sufficient to observe that no decision of the Supreme Court, our court, or a "consensus of courts" would have put Dr. Aranas on notice that treatment prioritization schemes like MD 219 violated the Eighth Amendment during his time as NDOC Medical Director. Dr. Aranas is entitled to qualified immunity.

## IV.  CONCLUSION

We reverse the district court's order and remand with instructions to grant summary judgment for Dr. Aranas.

**REVERSED AND REMANDED.**